J-S43014-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: N.H., A MINOR | : IN THE SUPERIOR COURT OF |
| | :      PENNSYLVANIA |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| APPEAL OF: A.H., BIOLOGICAL | : |
| FATHER | : No. 90 WDA 2017 |

Appeal from the Decree Entered December 19, 2016
In the Court of Common Pleas of Allegheny County
Orphans' Court at No:  CP-02-AP-040-2016

BEFORE:   STABILE, SOLANO, and FITZGERALD[*], JJ.

MEMORANDUM BY STABILE, J.:              **FILED SEPTEMBER 21, 2017**

A.H. ("Father") appeals from the decree entered December 19, 2016, in the Court of Common Pleas of Allegheny County, which involuntarily terminated his parental rights to his minor daughter, N.H. ("Child"), born in December 2013.[1]  After careful review, we affirm.

The orphans' court summarized the factual and procedural history of this matter as follows.

> [The Allegheny County Office of Children, Youth and Families (OCYF)] originally became involved with the family in December of 2009 after receiving a referral alleging Mother was actively using drugs and that [Child's older siblings] were not being properly supervised.  That case was closed in April of 2010.  There were numerous other referrals made but all were

---

[*] Former Justice specially assigned to the Superior Court.

[1] The decree also terminated the parental rights of Child's mother, S.A. ("Mother").  The disposition of Mother's appeal is by separate memorandum.

closed without further court intervention. OCYF received the most recent referral on September 20th, 2013, and the concerns were similar to the prior referrals. These concerns centered on the lack of supervision of the children, Mother's substance abuse, deplorable housing conditions, and domestic violence between the parents. Additionally, the oldest child had appeared at school with physical marks on his face. An OCYF caseworker met with Mother on September 25, 2013, at which time she admitted to actively using heroin and suffering from mental health issues. Additionally, Mother reported that she had recently filed a Protection From Abuse Petition (hereinafter PFA) against Father and that she had relapsed shortly thereafter. Mother and the children were listed as protected parties in the PFA Petition.

Shortly after Mother's admissions, an OCYF caseworker went to Father's home where he found Mother and the children despite the active PFA Petition. Mother refused to allow the caseworker into the home and eventually the local police had to assist OCYF in gaining entry into the home. Mother reported that she had spoken to Father and that he had advised her not to open the door. The house was observed to be in deplorable condition with no running water or working electricity. At that time, the caseworker created a safety plan for the family wherein Mother agreed to stay with a friend and refrain from allowing the children to have contact with Father.

Approximately one month later, Mother and the children were again discovered in Father's home. OC[YF] created another safety plan for the family [in] December [of] 2013. [Child] was born the following day . . . . The child was born at approximately 30 weeks, weighed 2 pounds and 6 ounces and tested positive for both cocaine and methadone. After the child's birth, Mother admitted to using heroin and crack cocaine three days prior. Furthermore, she admitted to using crack cocaine throughout her pregnancy. The City of Pittsburgh Police reported receiving a 911 call from Mother on February 2nd, 2014, reporting that Father had punched her in the face while at the hospital with [Child]. The responding officer observed swelling above Mother's eye and Father was charged with simple assault and was also charged with violating the PFA.

The child remained in the hospital until she was medically cleared to return home on February 5th, 2014. The child was

permitted to be released into Mother's care because In-Home Services through Holy Family were working with Mother in her home and addressing drug and alcohol treatment and parenting. However, OCYF made it clear that the child was to attend every scheduled medical appointment as she was considered a medically fragile child. Mother missed an appointment shortly thereafter and OCYF requested and was granted an Emergency Custody Authorization on February 19th, 2014. It was also reported to OCYF that Mother did not have stable housing and had been the victim of yet another domestic violence incident with Father. OCYF discovered that Mother withdrew the PFA Petition in March of 2014.

An Adjudicatory Hearing was held on April 1st, 2014 at which time both Father and Mother stipulated to Dependency. Mother stipulated that the child was born positive for both cocaine and methadone, that she was in need of drug and alcohol treatment, and that there was an active PFA Petition excluding contact between herself[,] the children[,] and Father. Father stipulated that he had criminal charges pending as a result of an alleged domestic violence incident with Mother and inadequate housing. . . .

Orphans' Court Opinion, 2/10/17, at 2-5 (footnotes omitted).

On March 2, 2016, OCYF filed a petition to involuntarily terminate Father's parental rights to Child. The orphans' court conducted a termination hearing on July 22, 2016, and September 23, 2016. Following the hearing, on December 19, 2016, the court entered the decree complained of on appeal, in which it terminated Father's parental rights. Father timely filed a notice of appeal on January 12, 2017, along with a concise statement of errors complained of on appeal.[2]

_____

[2] Father's counsel initially failed to file a docketing statement. As a result, on March 14, 2017, this Court entered a *per curiam* order remanding this matter to the orphans' court to ensure that Father's counsel had not

*(Footnote Continued Next Page)*

Father now raises the following issue for our review. "Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that OCYF met its burden of proving by clear and convincing evidence that termination of [Father's] parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S.[A.] §[]2511(b)[?]" Father's Brief at 8.

We consider Father's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

*(Footnote Continued)* ————————

abandoned him. The court held a hearing on March 17, 2017, and entered an order on March 22, 2017, finding that counsel did not abandon Father. Counsel filed a docketing statement on April 3, 2017.

- 4 -

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b), which provides as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> ***

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

> ***

> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement

with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).

At the outset, we observe that Father focuses his argument on appeal almost exclusively on Section 2511(b). However, in a single paragraph in the argument section of his brief, and in the conclusion paragraph at the end

of his brief, Father attempts to challenge the termination of his parental rights pursuant to Section 2511(a). **See** Father's Brief at 15, 19. Father waived any challenge to Section 2511(a) by failing to include it in his statement of questions involved, and in his concise statement of errors complained of on appeal. **See In re M.Z.T.M.W.**, 2017 Pa. Super. LEXIS 360, 2017 WL 2153892 (Pa. Super. 2017) (holding that the appellant waived her challenge to Section 2511(b) by failing to include it in her concise statement and statement of question involved). Thus, we need only address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b). The requisite analysis is as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

In its opinion, the orphans' court found that OCYF presented overwhelming evidence in support of its petition to terminate Father's parental rights. Orphans' Court Opinion, 2/10/17, at 15. The court explained that Child recognizes Father and is minimally bonded to him, but that "it is both unrealistic and unhealthy to expect [Child] to wait in abeyance while the parents attempt to attain stability." *Id.* at 13. The court emphasized Father's unresolved history of domestic violence, as well as Child's bond with her foster parents. *Id.* at 13-15.

In response, Father argues that he and Child are strongly bonded, and that terminating his parental rights will deprive Child of his love and affection. Father's Brief at 16-17. Father argues that the orphans' court failed to give serious consideration to this bond, and relied too heavily on its belief that Child would be better off in her foster home. *Id.*

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion. During the termination hearing, OCYF presented the testimony of psychologist, Terry O'Hara, Ph.D. Dr. O'Hara testified that he conducted three interactional evaluations of Father and Child, and that Father displayed positive parenting skills. N.T., 9/23/16, at 46. Dr. O'Hara also observed "some signs of attachment" between Child and Father. *Id.* at 48. "[D]uring the most recent

interactional, [Child] did grow more calm and relaxed with her father as the evaluation progressed. . . . She did direct herself to her father. She made vocalizations." *Id.*

However, Dr. O'Hara expressed concern regarding Father's history of alleged domestic violence. *Id.* at 55-56. Dr. O'Hara explained that he reviewed several PFA petitions and police reports, and that "[Mother] has alleged that [Father] had tackled her, grabbed her, slammed her head off concrete, punched her in the face with a closed fist, kicked her, grabbed her by her neck, strangled her, threw her to the ground. That these instances have been witnessed by the children."[3] *Id.* at 39-40. Father takes no responsibility for Mother's domestic violence allegations, and claims that Mother "has continuously fabricated allegations against him of assault and violence. From his perspective, she has injured herself on purpose to have injury when the police showed up." *Id.* at 44-45, 72.

_____

[3] Father's most recent act of alleged domestic violence took place on January 12, 2016. According to Officer Troy Signorella, of the Pittsburgh Police, Mother reported that Father "picked her up and slammed her on the ground," and that Father also "slammed" the head of one of Child's older siblings "into the car door outside." N.T., 9/23/16, at 11-14. Officer Signorella testified that he felt Mother's head, and that she had a small bump on her head consistent with "[b]eing hit or struck either on the ground or [with] some sort of object[.]" *Id.* at 14. Officer Signorella arrested Father that evening, and Father was charged with simple assault and endangering the welfare of a child. *Id.* at 15. Officer Signorella recalled that Mother later recanted her allegations, and that the charges against Father were withdrawn after he completed anger management classes. *Id.* at 16, 25.

While Dr. O'Hara acknowledged that Mother often recants her allegations of domestic violence, he cautioned that this does not mean that Father is a suitable parent for Child. *Id.* at 40-41, 74, 77-78. He explained,

> It's very concerning that [Father] would remain in a relationship with someone who was so manipulative and had caused so much suffering for himself and his family if this were in fact true.

> ***

> . . . . And then if it were to be true that [Mother] is fabricating these allegations, I don't have evidence that he is able to show a protective capacity in removing himself from unstable relationships in order to protect his children from police involvement and these types of occurrences.

*Id.* at 74, 77-78.

In addition, Dr. O'Hara testified that Child is thriving in the care of her foster parents, with whom she has lived for over thirty months. *Id.* at 83. Dr. O'Hara explained that he evaluated Child with her foster parents on three occasions. *Id.* at 50. "During her interactions with her foster parents [Child] is autonomous, euthymic, curious and frequently directs herself to her foster parents. They also, in my opinion, have excellent parenting skills as well." *Id.* at 49. Removing Child from the care of her foster parents would be "very psychologically detrimental for her." *Id.* at 83.

Ultimately, Dr. O'Hara opined that Child should be adopted by her foster parents. He summarized his conclusions as follows.

> I think it would be ideal for [Child] to have an ongoing relationship with her father. I think that she has some positive

characteristics in this relationship, and I think it would be a benefit for her.

However, on the other hand [Child] has been placed with her foster parents for approximately 30 months. The foster parents present with significant stability. They also show excellent caring skills over time, as I've noted, and [Child] exhibited securing an attachment with them. Very consistently she has done that in the three times that I've seen her with the foster parents.

It's my opinion that any detriment that would occur in termination of [Child's] relationship with [Father], any detriment would be outweighed by the benefit that [Child] gains in her relationship with her foster parents.

She is a kid who has, as I've mentioned, she has been in placement for much of her life. I think she is thriving in the placement where she is, and as I've testified many times before with regard to attachment, there are so many developmental schemes that really depend upon a sense of security and stability for children. There is a reduction in risk for psychopathogy, [*sic*] there is an increase of school readiness for children. There are benefits in emotional learning and emotional regulation and cognitive learning for children who have security and safety and a secure attachment.

So based upon these considerations, I am of the opinion within a reasonable degree of certainty that the benefits for [Child] remaining with her foster parents and being adopted by them would outweigh any potential detriments in the termination of parental rights of [Child] with regard to [Father].

*Id.* at 49-51.

Thus, the record confirms that terminating Father's parental rights will best serve Child's needs and welfare. The record supports the finding of the orphans' court that Father is incapable of providing a safe and stable home for Child, due to his unresolved history of domestic violence. In addition, it would be psychologically detrimental to remove Child from the care of her

foster parents, with whom she has lived for nearly her entire life. While Child has a somewhat positive relationship with Father, it was within the court's discretion to conclude that the benefits of permanency through adoption would outweigh whatever harm Child might experience if her relationship with Father is ended. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to Child. We therefore affirm the court's December 19, 2016 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/21/2017

- 12 -